## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS/SHERMAN DIVISION

| | | |
|---|---|---|
| TREVER KYLE JESTER | ) | JUDGE |
| BRAD AND GINGER JESTER | ) | CASE NO: |
| WESLEY AND BRITTANY JESTER | ) | |
| MARK AND KATHLEEN LIEBERMAN | ) | |
| STANTON AND ERIKA SPRABARY | ) | |
| OLIVIA BARNARD | ) | |
| Plantiffs | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| JUSTIN PAUL | ) | |
| WENDY WALKER | ) | |
| Defendants, | ) | |

# EMERGENCY – EX-PARTE

### PETITION TO INVALIDATE COURT PROCEEDINGS ICWA VIOLATIONS

COMES NOW the Petitioners, Trever Jester, Brad and Ginger Jester, Wesley and Brittany Jester, Charles Stanton and Erika Sprabary, Mark and Kathleen Lieberman the undersigned, and moves the Court to Invalidate the child custody proceedings for the guardianships PG-2020-38, PG-2020-557 and PG-2022-640 involving an Indian child pursuant to the Indian Child Welfare Act of 1978, 25 U.S.C. §1914 due to ICWA violations.1911 (a), (b), (c), 1912 (a), (b), (c), (d), (e), (f), 1915 (b). § 1914. Petition to court of competent jurisdiction to invalidate action upon showing of certain violations. Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title. (Pub. L. 95-608, title I, § 104, Nov. 8, 1978, 92 Stat.3072.)

Table of Contents

# Contents

FACTUAL GROUNDS FOR PETITION ................................................................................................ 2

PARTIES ........................................................................................................................................................ 5

COMPLAINT................................................................................................................................................. 8

RELIEF SOUGHT ...................................................................................................................................... 15

BACKGROUND AND CHAIN OF EVENTS ........................................................................................ 18

TEMPORARY MOVE TO OKLAHOMA ............................................................................................... 19

    DEFENDANTS MEET T.A.J. .............................................................................................................. 19

    ABUSE BEGINS ................................................................................................................................... 19

    STATE OF TEXAS RESTORES FULL PARENTAL RIGHTS ................................................... 20

    ALEX AND CHILD RELOCATES DUE TO THE ABUSE ........................................................ 20

    12/9/2019 DOG MAULING AT DEFENDANTS HOME .......................................................... 20

    1/5/2020 - ARRANGEMENTS FOR TRIP TO TX FOR COURT .......................................... 20

    1/9/2020 - COURT IN TEXAS (exhibit 19 - Court 1-9-2020)................................................... 21

    1/13/2020 - SUBMITS DHS CLAIM OMITS FELONY RECORD/ABUSE ........................... 21

    1/14/2020 - ALEX GETS BACK FROM TEXAS TRIP ............................................................... 21

1/15/2020 - PETION FOR ER GUARDIANSHIP EX-PARTE................................................................ 21

    DEFENDANTS KIDNAP CHILD, CLAIM CHILD RESIDES WITH THEM............................. 21

    TEXAS JURISDICTION ..................................................................................................................... 22

    TEXAS HOME STATE (exhibit - Texas initial case) ....................................................................... 22

    TEXAS SIGNIFICANT CONNECTION ......................................................................................... 22

1/2022 - MOVE TO ADA, OKLAHOMA WITH CHICKASAWS .......................................................... 32

DEATH OF MINORS MOTHER ............................................................................................................... 33

DEFENDANTS CONCEAL THE DEATH OF ALEX FOR 8 HOURS.................................................. 33

 8/17/2022 - ER PETITION FOR GUARDIANSHIP (PG-2022-640) .................................................. 34

9/13/22 - CHICKASAWS APPOINT GUARDIANS (PG-2022-40) ...................................................... 37

9/15/2022 - HEARING (PG-2022-640) .................................................................................................... 38

12/7/2022 - HEARING (PG-2022-640) .................................................................................................... 44

    FATHERS INDIAN AND CONSTITUTIONAL RIGHTS VIOLATED ................................... 44

    FATHERS PETITION TO TRANSFER/DISMISS DENIED, NO GOOD CAUSE ................... 44

    ACTIVE EFFORTS NEXT TO IMPOSSIBLE ............................................................................... 49

# FACTUAL GROUNDS FOR PETITION

1. The child subject to this action is an "Indian child" as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4), in that the child is under age eighteen, date of birth 11/8/2017, and is a member of the Chickasaw Nations, Enrollment No. 89617 (Exhibit 1 - T.A.J. Indian Member Card).

2. Trever Kyle Jester is the Natural "Indian" Father of the T.A.J. and is the child's only surviving parent.  (Exhibit 2 - Paternity)

3.  The Chickasaw Tribe is an Indian tribe as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(8), and this fact is entitled to judicial notice by virtue of publication in the Federal Register 86 FR 7554.

4.  In 2023, the U.S. Supreme Court upheld the Indian Child Welfare Act of 1978. The ICWA is a federal law that governs the removal and out-of-home placement of Native American children. The law established standards for the placement of Indian children in foster and adoptive homes and enabled tribes and families to be involved in child welfare cases. *Child custody proceedings in a State Court involving an Indian Child are subject to compliance with ICWA.*  ICWA protects children's and parents' constitutional rights. ICWA provides additional procedural and substantive safeguards that recognize parents' constitutional right to care for their child and the child's corresponding right to family integrity.  (exhibit 3 - ICWA)

5.  This court has jurisdiction over ICWA matters and is a "competent court" to invalidate court proceedings due to ICWA violations pursuant to;

*§ 1914. Petition to court of competent jurisdiction to invalidate action upon showing of certain violations.  Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.*

The Mann Court cited the Indian canon of construction from Montana v. Blackfeet, where "federal courts will liberally construe a federal statute in favor of Indians, with ambiguous provisions interpreted for their benefit. In resolving the ambiguity of whether ICWA provided jurisdiction for federal courts, the Mann Court concluded that § 1914 of ICWA provided federal courts with "authority to invalidate a state court …

In <u>Mann II</u>, 415 F.3d 1038, the Ninth Circuit found no reason to foreclose a <u>§ 1914</u> action in federal court, even where the parties had participated in the state court proceeding. This accords with an earlier decision in the Tenth Circuit, <u>Roman-Nose v. New Mexico Dep't</u> of <u>Human Servs.</u>, 967 F.2d 435 (10th Cir. 1992), which found no reason to prevent a federal court action by parents who participated in a New Mexico state court ICWA proceeding.

*1060 While there is little case law construing § 1914, the guardian ad litem's interpretation is consistent with the intent of ICWA to promote the stability of Indian tribes and families, see 25 U.S.C. §§ 1901-02, and is supported by the legislative history of § 1914. See H.R.Rep. No. 1386, 95th Cong., 2d Sess. 23, reprinted in 1978 U.S.Code Cong. & Ad.News 7530, 7546 (§ 1914 authorizes a parent "to move to set aside any ... termination of parental rights on the grounds that the rights secured under sections [1911, 1912, or 1913] were violated"). This interpretation of § 1914 also follows the rule that statutes enacted for the benefit of Indians must be liberally construed *with all doubts resolved in favor of the Indians.* Preston v. Heckler, 734 F.2d 1359, 1369 (9th Cir.1984

6.  See Noel v. Hall, 341 F.3d 1148, 1156 (9th Cir.2003) (federal district court must refuse to hear "a forbidden de facto appeal from a judicial decision of a state court").    We ultimately conclude, however, that the federal district court had jurisdiction to consider Mary Doe's complaint because the federal district court had federal question jurisdiction over Mary Doe's claims, and §  1914 grants federal district courts the authority to invalidate state court actions that violate §§  1911, 1912, and 1913.

7.  The Bureau of Indian Affairs asserts;  20.5 - Is invalidation of a foster care placement or termination of parental rights mandatory under <u>1914</u> upon a showing the Act has been violated?

Yes. See, e.g., <u>In re L.A.M.</u>, 727 P.2d 1057 ( Alaska 1986); <u>In re Morgan</u>, 364 N.W.2d 754 (Mich. Ct. App. 1985); <u>In re H.D.</u>, 729 P.2d 1234 (Kan. Ct. App. 1986).  The court ruled that the federal court had subject matter jurisdiction under the ICWA to proceed.

8.  ICWA § 1921. Higher State or Federal standard applicable to protect rights of parent or Indian custodian of Indian child.  In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard.

9.  More than a decade ago, we resolved that ICWA creates an implied cause of action and thus serves as a basis for federal question jurisdiction under 28 U.S.C. §  1331.   In Native Village of Venetie v. Alaska, 944 F.2d 548 (9th Cir.1991) ("Native Village of Venetie I"), we concluded that Congress intended to create a federal private right of action in tribes and individuals to seek a determination of their ICWA rights and obligations in federal district court under ICWA's full faith and credit clause in §  1911(d):

<u>We</u> see no reason that Congress would not have intended to give Indian tribes access to federal courts to determine their rights and obligations under the Indian Child Welfare Act. The Act includes an express congressional finding that state courts and agencies have often acted contrary to the interests of Indian tribes.

It would thus be ironic indeed if Congress then permitted only state courts, never believed by Congress to be the historical defenders of tribal interests, to determine the scope of tribal authority under the Act.

Without a cause of action under the Indian Child Welfare Act, [the individual tribal members] would be essentially left without a remedy.   We cannot conceive that Congress intended such a self-defeating result.

# PARTIES

Father - Trever Kyle Jester, d.o.b. 2/9/1990, Plaintiff and Petitioner

8123 Hilltop Road, Argyle, Texas 76226


Paternal Grandfather - Brad Keith Jester, Plaintiff and Petitioner

Paternal Grandmother - Ginger Lynette Jester, d.o.b. 7/24/1958, Plaintiff and Petitioner

1001 Greenwood Lane, Lewisville, Texas 75067


Maternal Grandfather - Mark Joel Lieberman, Plaintiff and Petitioner

Maternal Grandmother - Kathleen Diane Lieberman, d.o.b. 9/28/1956

1704 Pine Hills Lane, Corinth, Texas 76210


Paternal Uncle - Wesley Keith Jester, d.o.b. 3/4/1987, Plaintiff and Petitioner

Paternal Aunt - Brittany Michelle Jester, d.o.b. 7/20/1988, Plaintiff and Petitioner

8123 Hilltop Road, Argyle, Texas 76226


Maternal Aunt – Olivia Bernadette Barnard, d.o.b. 12/29/1976, Plaintiff and Petitioner

715 Emma Loop Road, Austin, Texas 78737


Maternal Uncle - Charles Stanton Sprabary, d.o.b. 8/21/1974, Plaintiff and Petitioner

Maternal Aunt - Erika Lynette Barnard-Sprabary, d.o.b.  8/21/1975, Plaintiff and Petitioner

209 Traveller Street, Hickory Creek, Texas 75065


Justin Paul and Wendy Walker

6808 E. 6th Court

Tulsa, Oklahoma 74129

JURISDICTIONAL   STATEMENT


This Court has Jurisdiction over federal laws such as the ICWA and diversity of jurisdiction.  The instant lawsuit unambiguously sets out a controversy between Union citizens of different states for the purpose of the Cour's diversity jurisdiction under 28 U.S.C. 1332(a)(1).  The controversy further involves the monetary amount as alleged in the Complain which exceeds $75,000 USD for the invocation of the Federal Court's jurisdiction under 28 U.S.C. 1332 (a).  Accordingly, Article III, Section 2, Clause 1 to the United States Constitution clearly grants Congress authority to confer jurisdiction onto the federal district courts over controversies between Union citizens from different states as properly allege in the civil complaint.  Moreover, and pursuant to 28 U.S.C. 1367(a) federal courts routinely exercise supplemental jurisdiction over state-law claims when the claims are closely related. The factual predicates alleged for purpose of the Court's supplemental jurisdiction and as set out in our complaint fall within the ambit of a closley related state law claim and more specifically the ICWA, Texas Family Code and Oklahoma whereas the United States District Court for the Eastern District of Texas has jurisdiction over the subject-matter and over the parties as matters of facts and law pertaining to this cause.


The Court has also emphasized that the minimum contacts inquiry should not focus on the location of the resulting injury to the plaintiff; instead, the proper question is whether the defendant's conduct connects him to the forum in a meaningful way.


The defendants have had contact with Denton County in the way of participating in last two months of the Texas, Drug Court of Denton Program, Case 18-3808-211.  The defendants were entrusted to monitor the mothers return to the child, despite the defendants never meeting the child until such point.  Two months after the State of Texas ordered Alexandra Hayden Paul the Sole Conservator of T.A.J., the defendants filed an "emergency guardianship" in the

state of Oklahoma, claiming Oklahoma was her home state without notice to the  State of Texas, her Tribe, Mother and Father as well as her family that had raised her.  Even after the defendants aided the Tulsa District Court to usurp the jurisdiction of Texas, the minor child was rightfully returned to her mother and her omestate of Texas upon the Tulsa District Courts finding that the allegations of Wendy Walker were false and that "no emergency existed".  As well as ICWA violations.  Alex then executed a written declaration in Texas designating her mother, sister or step brother as guardians to her daughter in the event of her death.  (Kathleen Lieberman, Erika Sprabary, Kevin Lieberman).  Alex and child remained in Texas at home in Texas until 8 months before her untimely death when Alex decided to move to Ada, with the help Chickasaws , it was then that she allowed the defendants a mere 5.5 months of visitation (with the condition that they sign a written document stating they would return the child) until she had to shut it down again.  Then upon her death, the defendants lied to law enforcement and wrongfully took the minor to Oklahoma instead of informing the only parent and family that would return to Texas.

# COMPLAINT

There are serious concerns regarding the safety and wellbeing of the minor child in the care of Justin Paul and Wendy Walker.  At 9:01 am on 8/12/2022, the defendants were the first to be notified of the death of Alexandra Hayden Paul, the minor's mother due to T.A.J.s failed attempts to contact her Grandma, Grandpa and Aunt (see exhibit 46 - vm from T.A.J. to Gran, exhibit -110 last calls),  The defendants then wrongfully gained physical possession of the child by lying to law enforcement, DHS, ICW and concealing her death from us for over 7 hours.  Had the defendants notified us, Justin Paul knew he would not have been permitted to leave with the child.  It is revealing that Wendy Walker did not find the occasion important enough to attend the scene and instead let her boyfriend Justin Paul, a three-time felon whom does not possess a driver's license pick up the child (exhibit 49 - text Justin Paul sent to pick up T.A.J).  Despite these glaring red flags and the fact Kathleen Lieberman was listed on all of Alexandras emergency contacts, including the child's school, the authorities released the child into his care and allowed him to transport her off the reservation to Tulsa, Oklahoma. (exhibit - emergency contacts)

 Subsequently, Wendy Walker (the live-in girlfriend of Justin Paul), whom is of no relation to the child by blood or marriage petitioned for the emergency guardianship without Justin Paul as to avoid his criminal record, claiming she was the child's only family and that the child had resided with her the last five years (exhibit 120 - UCCJEA 2020 and 2022, exhibit - 55 - PG-2022-640 Application for Special Guardianship 1053261822).

This will mark the third attempt by the defendants to secure guardianship of the minor child under false pretenses through the Tulsa District Court.   Each attempt, petitioned on a purportedly "emergency" basis to avoid detection of her family and to gain an unfair litigation advantage demonstrates a clear pattern of manipulating the legal process.  The instruments in which the defendants nominated themselves, each time, contained numerous intentional fabrications and withheld crucial information about the minor's living situation, familial relationships, pertinent Texas case, and defendant's background.  A pattern of exploiting her parents that began just months after meeting the child when she was two years old.  The defendants' intentional omissions and false statements (that were not validated by the Court) have aided the Tulsa District Court to usurp jurisdiction from The State of Texas and the Chickasaw Tribe and created a distorted representation of the circumstances surrounding this

case and most assuredly have harmed the minor child in the process.  This pattern of criminal behavior cannot be overlooked and must be addressed promptly to ensure the safety of T.A.J.

There is an obvious adverse interest at play as the minor's mother knew all too well and executed a written declaration designating Kathleen Lieberman (her mother) or Erika Sprabary (her sister) to be guardians of her daughter in the event of her death.  She specifically made mention that her daughter was born and raised in Texas except for when the defendants "kidnapped" while temporarily staying at her bio fathers house in Oklahoma. She also left a file she called "in case they try to take her again" with evidence of the defendants' extensive abuse towards her,the domestic violence she and her daughter were subjected to in their home, and the traumatic injury inflicted on her daughter by their dog in their home.

The defendants were fully aware of Alex Paul's opposition to them ever taking her daughter again as she would not permit them to even visit with the child without signing a document promising they would not take her child, as they had done twice before.  One example of what Alex called her "protections" is reflected in this text between Alex and Wendy Walker less than 4 months before her death (April of 2022).

Wendy Walker:        "BTW Justin called bitchin bout that letter"

Alex Paul:        "I don't think you'll try that sh*t again the Taylynn but you told me back then Never do that and you ended up doing it anyway.  Surely, he can understand I'm just trying to cover my ass.  ***He's not going to bully me when it comes to Tay***."  (exhibit - Alex protections).  Sadly, they "ended up doing it again anyway" and the bulling continues.

This boils down to Alex allowing the defendants (reluctantly) back into her life for a mere 5.5 months, just as it only took 5 months after meeting the child to take her the first time.  She believed she had "protections" in place that would protect her daughter from the defendants but cut off all visitation with the defendants 2 months before she died, stating "Wendy is after my kid again" (exhibit – Affidavit – Ginger Jester, exhibit - Brittany Woods-Jester).   Just 8 months before the death of Alexandra, the defendants were estranged from Alexandra and her child and questioned whether or not the child still remembers her.  (exhibit - she remembers your fighting).

The defendant's sudden obsession with the child, just months after meeting her, the isolating her from her entire family is unnatural and raises concerns about their true motivations for seeking

guardianship. We believe the motive behind these repeated guardianship attempts is driven by a desire to separate the child from her family and raise her as their own, particularly in light of their inability to raise their own children. In the mother's words, "he wants to punish me and she's obsessed with my daughter because she didn't get to raise her own three girls", is revealing.

It is evident that the guardians have not acted in the best interest of T.A.J., and their actions raise serious concerns about the well-being of the minor. It is equally obvious that there is no resemblance of due process whatsoever in the proceeding. We respectfully request that the Court invalidate the current court proceedings pursuant to 1914 and ensure a fair and lawful process that complies with the provisions of ICWA. The child's well-being and cultural heritage are at stake, and it is crucial to rectify these violations to protect her rights.

This Tulsa District Courts negligence to comply with UCCJEA, Oklahoma Statues, Texas Statues and ICWA resulted in the usurping of Jurisdiction, the child being improperly removed and held in Oklahoma causing the child to be separated from her mother, maternal family and the breaking up an Indian Family (Paternal family).  The mother and our families were burdened with the financial and distance hardship to continually drive to Tulsa, while the defendants merely had to drive down the street.

This brings to question the constitutionality of guardianships. Clearly it is an injustice for a child to be taken from her parent simply because someone alleges a wrongdoing. The parent is then deemed guilty and has to prove their innocence.

It is also noteworthy that neither Justin Paul nor Wendy Walker had a pre-existing relationship with the child's mother throughout the first 27 years of her 30 years of life. The initial petitioner, Wendy Walker, is not related to the child by blood or marriage and relies on a common-law marriage claim to establish a connection through a half-uncle, who is three-time felon.

The current guardianship proceedings have been much like the first two cases. No validation of instruments and there has been a blatant lack of service to the state of Texas, the tribe, the child's father, mother, and family. The court has proceeded without properly serving notices and documents to the relevant parties, depriving them of the opportunity to participate in the proceedings and defend their rights as per ICWA requirements. The proceedings have been

marred by multiple violations of the Indian Child Welfare Act (ICWA), specifically under sections 1911(a), (b), (c), (d), 1912(a), (b), (c), (d), (e), and (f). The issues at hand include but are not limited to improper notice, denial of tribal court jurisdiction, improper removal and retention of the Indian child, and disregard for Indian placement preferences, and lack of active efforts.

Furthermore, the court has ignored the father's rightful request to have the proceedings transferred to the Tribal court. The Chickasaw Nation has already appointed guardians for the child, and the father has consented to this arrangement. However, the Tulsa District court proceeded without good cause, denying the father the opportunity for a fair hearing by proceeding without him having representation. The Tulsa District Court has also failed to consider the nomination of guardians made by both parents.

 After wrongfully obtaining their 3rd guardianship the child has been deprived of any contact with her Father, Brother, Grandparents, Aunts, Uncles and cousins that she was raised with and had a continual relationship since her birth. The mother of this child was taken advantage of and subjected to cruel treatment by the defendants when she was the most vulnerable and then upon her death.  The same treatment is sure to come to the child as her mother stated just two weeks before her death **"I don't want TAJ anywhere around Justin or Wendy...she is fake and Justin will destroy her like he did me".** The Defendants concealment of the mother's death for 8 hours and refusal to get the child medical attention then driving her to Tulsa without a driver's license in their haste to take the child before detection is testimony in itself. The manner in which the defendants have stewarded their guardianship is further evidence of no best interest of the child. The fact the defendants were unknown to virtually everyone in the lives of the Texan father and mother.  Liaison for ACTIVE EFFORTS/POA = Erika Sprabary was designated by the families to be the liaison since she is the only one that knew Justin Paul.  Erika has attempted hundreds of times to secure visitation for the Paternal and Maternal families but is ignored. She has beseeched the defendants to at least allow her niece to speak to her grandmother since it was her first Mother's Day without her daughter and it was the first Mother's Day for TAJ without her mother. As of recent, Erika has nothing short of begged them to let T.A.J. speak to her Grandpa before he dies. This was completely ignored as well.

The child's father and only surviving natural parent has had his constitutional rights violated at every turn. Whether or not he is capable of being her primary care giver or not is not the issue at hand. The father is not petitioning for custody at this time, only to direct the upbringing of his daughter, especially now that her mother is deceased. At the very least, he and the mother of the child have a right to contest a guardianship that they have direct knowledge is harmful for their daughter.  Here we have the love of a mother and father guiding the court as to what is in the best interest of this child yet, the Tulsa district Court has ignored them due to their susceptibilities. The defendants have kidnapped this child from her own mother, refused to return her multiple times, has lied to law enforcement, ICW, DHS and the Tulsa District Court.

The continued omission of all family information and false claims as to the child's history on crucial documents such as the UCCJEA, Active Efforts Affidavits, Petitions, etc. point to a deliberate attempt to manipulate the legal process. The Courts disregard evidence of domestic violence, abuse, excessive alcohol consumption and the inability to protect the child from a dog mauling further brings to question the validity of the appointment.  There have been unnecessary delays and economic burdens for the plaintiffs that reside in Texas. To this day we have not had our day in court via continuance after continuance. Application of certain rules or procedures have not been uniform, leading to unequal treatment of the parties. Equality before the law is a cornerstone of a just legal system, and any deviations from this principle raise significant concerns.

**SEVERING INDIAN FAMILY AND MATERNAL FAMILY**

12/7/2022 - Court ordered Fathers visitation to be in Texas, every three weeks at Erika and Stanton Sprabary home as supervisors. (exhibit - 78)

12/15/2022 = Justin and his attorneys decided they were not going to obey court orders and told the Father and Erika that the visitation was going to be in Tulsa, under Justin Paul's supervision instead. Justin and the Tulsa District Court knew that Trever had no transportation and could not leave the state of Texas.  Most concerning is the fact that the Tulsa District Court entrusted Justin Paul to "help" the Indian Father after we delivered evidence of how horribly Justin treated the mother of the child under the guise of helping her. (exhibit - 82)

11/8/22 – T.A.J. Fifth birthday.  Maternal and Paternal families sent balloons with a gift from her Father (a stuffed animal, black and white puppy). The defendants would not give her the stuffed puppy from her Father.  Justin Paul stated to Erika, "what puppy, she already has a puppy".  Thisis yet, another demonstration of the defendants blatant disregard to prevent the breakup of an Indian family. Moreover, the disregard for the mothers family demonstrates how little the defendants care for Alexandra Hayden Paul. (exhibit – phone call, what puppy), (exhibit –delivery picture of puppy)

11/8/2023 – Balloons and candy sent from Maternal and Paternal families. Delivery company stated they called Justin Paul to confirm a time to deliver the gift. Stated he was extremely rude then hung up on her so she delivered shortly thereafter.  She could not confirm they received the gift even though someone was obviously home but refused to answer the door so she left on porch.

PG-2020-38 and PG-2020-557 - No Notice sent to the Tribe, Father, Mother or Father through the entirety

PG-2020-38 and PG-2020-557 = Active Efforts Affidavit, defendants wrongly claim the child has never lived in an Indian family.  She lived with her father when she was born and when her mother died.  She was placed with the Fathers brother in the Texas case to prevent the break up of their Indian Family.

PG-2020-38 (1/15/2020 - 8/26/2020) = Justin Paul and Wendy Walker had guardianship for over seven months without a background check.

PG-2020-640 12/7/2022 Hearing = Judge stated Erika and Stanton Sprabary could not be appointed due to not having a background check.

PG-2022-640 12/7/2022 Hearing = Judge allowed Justin and Wendys attorney to round up their "expert witness" (that have never spoke to anyone except Justin and Wendy) over the lunch break to testify via telephone.

PG-2022-640 11/2/2023 Hearing = Finally we were going to be able to have our side heard, yet the Judge did a continuance based on rule 34 stating the father needed to give a 30 notice before joining hearing via telephone. It is noteworthy to add that the Judge stated in previous hearings the father could join via zoom or telephone. It is also noteworthy that the Judge knew the burden and hardship on our family and witnesses to keep driving a 500 mile round trip, take off work, child care, hotel arrangements, and knowing we still had not had our side presented after wrongly not honoring our initial appointment from the Tribal Court, he ordered another continuance until 2/13/2024.  Then the 2/13/2024 hearing was continued as well.

# RELIEF SOUGHT

**INVALIDATE COURT PROCEEDINGS FOR PG-2020-38, PG-557, PG 2022-640 PURSUANT TO ICWA 1914 AND TULSA DISTRICT RULE 8.2.**

Given the gravity of these multifaceted concerns, we formally petitioning the court to invalidate the proceedings related to T.A.J. pursuant to ICWA 1914.

"In order for this court to find plain error, the error must affect substantive rights and be obviously prejudicial.  Burford, 515 P.2d at 383.   As we stated in Miller v. Sears, 636 P.2d 1183, 1189 (Alaska 1981), "[p]lain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted."

This is such a case.   The due process right to proper notice in a parental rights termination proceeding is so fundamental that justice requires us to consider S.M.'s claim of defective notice. Furthermore, the ICWA specifically authorizes a parent to "petition any court of competent jurisdiction to invalidate [a termination of parental rights] upon a showing that such action violated" certain ICWA provisions, including the act's notice requirements.  25 U.S.C. § 1914. [FN4] The guardian ad litem relies on this provision to argue that S.M. has a right under federal law to be heard on the defective notice issue even though it was not raised below."

**§30-4-801. Removal of guardians**.
**Universal Citation:** 30 OK Stat § 30-4-801 (2020)

A guardian may be removed by the district court for any of the following causes:

1. For abuse of his fiduciary responsibility.

2. For continued failure to perform his duties.

3. For incapacity to perform his duties.

4. For gross immorality.

5. For having an interest adverse to the faithful performance of his duties.

6. If the instrument in which the person was nominated as guardian is judicially determined to be invalid.

7. In the case of guardian of the property, for insolvency.

8. When it is no longer proper that the ward should be under guardianship.

R.L. 1910, § 3337. Amended by Laws 1988, c. 329, § 118, eff. Dec. 1, 1988. Renumbered from § 18 of this title by Laws 1988, c. 329, § 134, eff. Dec. 1, 1988.

**ATTORNEY FEES, TRAVEL FEES ETC.**

*§30-3-312. Jurisdiction acquired through unjustifiable conduct.*

*(a) If at any time a court of this state determines that it acquired jurisdiction to appoint a guardian or issue a protective order because of unjustifiable conduct, the court may:*

*(1) Decline to exercise jurisdiction;*

*(2) Exercise jurisdiction for the limited purpose of fashioning an appropriate remedy to ensure the health, safety, and welfare of the respondent or the protection of the respondent's property or prevent a repetition of the unjustifiable conduct, including staying the proceeding until a petition for the appointment of a guardian or issuance of a protective order is filed in a court of another state having jurisdiction; or*

*(3) Continue to exercise jurisdiction after considering:*

*(A) the extent to which the respondent and all persons required to be notified of the proceedings have acquiesced in the exercise of the court's jurisdiction;*

*(B) whether it is a more appropriate forum than the court of any other state under the factors set forth in subsection (c) of Section 11 of this act; and*

*(C) whether the court of any other state would have jurisdiction under factual circumstances in substantial conformity with the jurisdictional standards of Section 8 of this act.*

*(b) If a court of this state determines that it acquired jurisdiction to appoint a guardian or issue a protective order because a party seeking to invoke its jurisdiction engaged in unjustifiable conduct, it may assess against that party necessary and reasonable expenses, including attorney fees, investigative fees, court costs, communication expenses, witness fees and expenses, and travel expenses. The court may not assess fees, costs, or expenses of any kind against this state or a governmental subdivision, agency, or instrumentality of this state unless authorized by law other than this act.*

*Oklahoma 30 Removal of Guardians*

In United States v. Throckmorton, 98 U.S. 61 (1878), this Court held that "There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments.

We have included a solution of a Guardianship by Power of Attorney by the surviving parent and request that the child be returned to her rightful family.

# BACKGROUND AND CHAIN OF EVENTS

The mother of the minor child, Alexandra Hayden Paul was born to Don and Kathleen Paul on 6/30/1992, (exhibit 1 - Alex Paul birth certificate).  Upon their finalized divorce on September 7th 1994, (exhibit 2 - Paul divorce) Kathleen was awarded custody of their baby daughter.   Shortly thereafter Kathleen and Alex moved to Texas, where Kathleen was from to secure the support of family.  Kathleen's first daughter, Erika Barnard-Sprabary soon followed as she did not want to be separated from her baby sister.  In 1997, Kathleen met Mark Lieberman whom she married in August of 1999.  Erika Barnard married Stanton Sprabary on their birthdays, August 21st of 1999.  Alex was a busy flower girl that month.  Mark and Kathleen purchased their home in which they still live today.  Alexandra not only grew up there, she resided there the majority of her adult life with her daughter as recent as 8 months before her unexpected death.  (exhibit 8 - residence history).   On 1/19/2002, Don Paul voluntarily relinquished his parental rights and designated "Kathleen Paul's husband, a prospective adoptive parent, Mark Joel Lieberman, as managing conservator" of Alex, (exhibit 4 - Don Paul voluntarily terminates rights).  Sadly, Don Paul nor the Paul siblings ever made an effort to see Alex or be involved in any capacity throughout her life.

11/8/2017 - T.A.J. Alexis Jester was born to Alex Paul and Trever Kyle Jester in Dallas, Texas.  They resided in Texas with the Lieberman's. (exhibit 5a - T.A.J. birth certificate and exhibit 5b  - T.A.J. Birthing Center).

4/9/2018 - Texas CPS Case #18-3808-211 opened.  (exhibit 6 - Texas case 18-3808-211).  Alex opted to enter in the Denton County Drug Court program to begin her recovery.
4/13/2018 - T.A.J. was placed with Wesley and Brittany Jester (Trevers Chickasaw brother) to prevent the breakup of an Indian family. As well as keep T.A.J. with her Chickasaw brother, Blaine.  The Sprabarys were approved by CPS to have unlimited visits, so Erika (Alex's sister) could help Brittany as needed and often kept her on weekends.

5/6/2019 – Alex was doing very well in her program and was able to obtain her own apartment for her and T.A.J., (exhibit 7 - Alex apartment).  She chose an apartment that was within 2 miles of her Mother, sister and Britanny Jesters home so they could continue to help.

7/2019 - Sometime in July, T.A.J. was placed at Stanton and Erika Sprabarys home due to a small set back, but Alex was still on track to graduate in October.  Meanwhile, Alex was corresponding with Justin Paul on Facebook messenger and he was encouraging her to go to Oklahoma rather than coming to Texas to see her.  (exhibit 9 - luring to Oklahoma)

# TEMPORARY MOVE TO OKLAHOMA

## DEFENDANTS MEET T.A.J.

8/2019 - In Alex's desire to know her father and siblings (exhibit - 86 fb post wishing and wondering), Alex made a rash decision to finish the last 2.5 months of her Denton County Drug Court recovery program in Oklahoma. She provoked this by telling CPS that Trever found out where Erika lived, therefore falsely claiming safety was breached. She did not inform them that Trever already knew where Erika lived, it was just a means to be able to persuade them to let her go to Oklahoma.

8/7/2019 - T.A.J. was relocated from Alex's sisters home to Oklahoma by Texas CPS.  Alex would follow a couple weeks later. (exhibit 10 - T.A.J.s Arrival).  What was supposed to be a 2.5 month stay would turn out to be what she called "the worst mistake of her life". (exhibit 86 - fb post wishing and wondering).

8/21/2019 - The nightmare began just days after T.A.J. arrived in Oklahoma.  After selling some furniture, Alex had the money the defendants requested and gas money to drive to Oklahoma to see her daughter but was told she had to wait until the next weekend. When she asked if she could stay the week she was told no, just the weekend (exhibit 11 - money money).

9/1/2019 - Alex joins T.A.J. in Oklahoma and resumes taking care of minor child.

## ABUSE BEGINS

9/28/2019 - The abuse begins (exhibit 12a - Justin Paul fb decipher, 12b, 12c) less than one month after herarrival.


## STATE OF TEXAS RESTORES FULL PARENTAL RIGHTS

11/12/2019 - The State of Texas restores full parental rights to Alex Paul. (exhibit 13 - Texas Order).


## ALEX AND CHILD RELOCATES DUE TO THE ABUSE

11/13/2020 - Alex moved out of Justin and Wendy's home the day after her rights were restored due to how cruel Justin treated her and the domestic violence between Justin and Wendy.  It was a common occurrence for Justin to get drunk and beat Wendy in front of T.A.J. During one of their fights, Alex tried to intervene to get Justin to stop hitting Wendy which put Alex in danger.  T.A.J. then intervened and told Justin not to hurt her mommy.  T.A.J. remembered their fighting long after they left. (exhibit 12c - she remembers your fighting, exhibit 12a)


## 12/9/2019 DOG MAULING AT DEFENDANTS HOME

After Alex moved out of defendant's home, she complained that Wendy was acting extremely possessive over her daughter and was harassing her to see T.A.J. (exhibit - 17 fb messenger Wendy obsessed Cooney).  One night Wendy wouldn't leave her alone so Alex went over there in an effort toappease her. Wendy was drinking heavily that night and decided to let her dogs inside while
T.A.J. was playing on the floor near the dog bowls. The dogs ran in and mauled her. Wendy and Justin lied to me and my husband, claiming she fell down and busted her head. Then tells Alex we didn't think it was a big deal.  (exhibit - 16a, 16b, 16c, 16d, 16e, 16f dog bite)


## 1/5/2020 - ARRANGEMENTS FOR TRIP TO TX FOR COURT

Alex makes child care arrangements in advance with Rachel and her father so she can attend to a court matter in Texas on 1/9/2020.  She did not permit Wendy to watch her daughter. (exhibit 15 - Wendy Walker Court arrangements).

1/9/2020 - COURT IN TEXAS (exhibit 19 - Court 1-9-2020)

1/13/2020 - SUBMITS DHS CLAIM OMITS FELONY RECORD/ABUSE

Wendy Walker submits a false DHS claim and makes allegations she did not witness that Alex was abusing her child by locking her in the bathroom with the lights off and outside with no shoes on as punishment. Something T.A.J. would do on her own often. (exhibit 14 - DHS referral, exhibit 23 - video of T.A.J. outside without shoes,). The abuse, domestic violence and dog mauling (just 3 weeks previous) was completely omitted from the DHS claim.

1/14/2020 - ALEX GETS BACK FROM TEXAS TRIP

# 1/15/2020 - PETION FOR ER GUARDIANSHIP EX-PARTE

1/15/2020 - 2.5 months after the State of Texas made the initial custody determination appointing Alexandra Hayden Paul as Permanent Sole Managing Conservator of T.A.J., the defendants file an emergency guardianship, alleging different allegations than they submitted to DHS just two days previous. They change from accidentally getting locked into the bathroom and outside to "The mother is on heroin and physiologically (terrifies) the child".  They do not disclose the abuse Alex and T.A.J were subjected to in their home.

DEFENDANTS KIDNAP CHILD, CLAIM CHILD RESIDES WITH THEM.

Justin/Wendy literally kidnap the child from her crib while her mother is asleep in the very next room then state, under oath, multiple times the child resides with them. **(**exhibit - ER petition,**)**

## TEXAS JURISDICTION

Texas case #18-388-211 4/30/2018 - 11/12/2019 made the initial child custody determination and had exclusive continuing jurisdiction.   (exhibit - 15 Texas initial case)

## TEXAS HOME STATE (exhibit - Texas initial case)

Defendants falsely claim Oklahoma is the child's home state when Alex nor child had been in Oklahoma 6 months (exhibit - 27 emergency petition).  Furthermore, their stay in Oklahoma was tobe temporary and they had no plans of living in Oklahoma permanently.

## TEXAS SIGNIFICANT CONNECTION

The Defendants failed to disclose the significant connection the mother and child had and will always have to Texas.  Both of T.A.J.s parents and their families live in Texas within a few miles from each other.  T.A.J. was born in Texas and has extensive medical records in Texas due to her congenital hypothyroidism diagnosed at birth, testing, speech therapy, OT and PT.  Texas had a year and a half of case records from her Caseworker, Supervisor, Legal Liaison, Attorney Ad Litem, Guardian Ad Litem, Regional Director of the BOA and Judge that was still open just 2 months before they filed their petition.  (exhibit 15 -tx case 18-3808-211,)

*Oklahoma nor the petitioners had any knowledge of her history or medical records.*  Defendants had just met the child a few months prior.  There was no connection to the State of Oklahoma other than the Natural Mothers Paternal side of her family whom never made one attempt to visit her in Texas throughout her entire life.

**§30-3-308. Jurisdictional requirements for appointing a guardian or issuing a protective order.**

A court of this state has jurisdiction to appoint a guardian or issue a protective order for a respondent if:

(1) This state is the respondent's home state;

(2) On the date the petition is filed, this state is a significant-connection state and:

(A) the respondent does not have a home state or a court of the respondent's home state has declined to exercise jurisdiction because this state is a more appropriate forum, or

(B) the respondent has a home state, a petition for an appointment or order is not pending in a court of that state or another significant-connection state, and, before the court makes the appointment or issues the order:

(i) a petition for an appointment or order is not filed in the respondent's home state,

(ii) an objection to the court's jurisdiction is not filed by a person required to be notified of the proceeding, and

(iii) the court in this state concludes that it is an appropriate forum under the factors set forth in Section 11 of this act;

(3) This state does not have jurisdiction under either paragraph (1) or (2) of this subsection, the respondent's home state and all significant-connection states have declined to exercise jurisdiction because this state is the more appropriate forum, and jurisdiction in this state is consistent with the constitutions of this state and the United States; or

(4) The requirements for special jurisdiction under Section 9 of this act are met.

**Jurisdictional Considerations**. Recognize that exercising temporary emergency jurisdiction does not take jurisdiction away from a court with preferred jurisdiction but does require judicial communication and a time limit if another court has long-term jurisdiction over the case. "Except in emergency cases, the UCCJA eliminated a child's physical presence in a State as grounds for exercising jurisdiction. As a result, a court could no longer base jurisdiction

*solely on a child's presence in the State, nor would a child's absence from the State necessarily deprive the court of jurisdiction. Under the UCCJA's extended home State rule, a left behind parent could petition for custody in the child's home State even after an abduction.*

**Oklahoma UCCJEA, § 551-201. INITIAL CHILD CUSTODY JURISDICTION**

*A. Except as otherwise provided in Section 16 of this act, a court of this state has jurisdiction to make an initial child custody determination **only if:***

*1. **This state is the home state of the child** on the date of the commencement of the proceeding, or was the home state of the child within six (6) months before the commencement of the proceeding and the child is absent from this state, but a parent or person acting as a parent continues to live in this state;*

*2. **A court of another state does not have jurisdiction under paragraph 1** of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 19 or 20 of this act, and:* **a. the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence, and b. substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;**

*3. All courts having jurisdiction under paragraph 1 or 2 of this subsection have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 19 or 20 of this act; or 4. No court of any other state would have jurisdiction under the criteria specified in paragraph 1, 2, or 3 of this subsection.*

*B. Subsection A of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this state.*

*C. Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination.*

**Child Welfare Services 340:75-1-29**

*4. Temporary emergency jurisdiction.*

*(1) A state court that does not otherwise have jurisdiction may enter an emergency order when a child is present in the state and a child was abandoned or a child, sibling, or child's parent is subjected to or threatened with mistreatment or abuse.*

**(2) When there was a previous child custody determination, the court making the emergency order must immediately communicate with the court that made the previous determination, to resolve the emergency, protect the child's safety, and decide duration of the emergency order.**

## NO NOTICE TO TEXAS, TRIBE, FATHER OR MOTHER

Texas, The Tribe, Natural Father and Mother were never sent notice throughout the **entirety of both cases** which is a clear ICWA violation as the defendant's attorney states in their response to the application for attorney fees.  **(exhibit – response to app for attorney fees)**

Alex Paul was one of the first to graduate the Denton County Family Drug Court Program that The Honorable Tiffany Haertling presided over.  She is still remembered and highly regarded to this day.  Had Texas been notified, the Tulsa District Court would have had the accurate information needed to make an informed decision as the best interest of the child.

## NO PROCEEDING UNTIL AFTER RECEIPT OF NOTICE

**Pursuant to ICWA 1912 a.** "No foster care placement or termination of parental rights proceeding shall be held  until at least ten days after receipt of notice by the parent or Indian custodian and the tribe".

## LACK OF ACTIVE EFFORTS

They falsely claim she had never lived in an Indian home on their Active Efforts Affidavit and that she of the Choctaw Tribe rather than Chickasaw. (exhibit PG-2020-38 Active Efforts).  There was no attempt to find Trever or his address.  (exhibit - phone call 1/15/2020).

## IMPROPER REMOVAL OF AN INDIAN CHILD PURSUANT TO;

**ICWA §1920**. Where any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian or has

improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over such petition and shall forthwith return the child to his parent or Indian custodian  unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger.

**Oklahoma UCCJEA, A**. Before a child custody determination is made under this act, notice and an opportunity to be heard in accordance with the standards of Section 8 of this act must be given to all persons entitled to notice under the law of this state as in child custody proceedings between residents of this state, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child....

See Oglala Sioux Tribe v. Hunnik, Case No. 5:13–cv–05020–JLV, Amicus Brief of the United States, at *5–6 (D.S.D. Aug. 14, 2014) (involving allegations that: (1) Defendants are conducting perfunctory 48-hour hearings that do not adequately gather or evaluate information necessary to determine whether emergency removals or placements should be terminated, and that the orders issued at the end of the 48-hour hearing do not adequately instruct State officials to return the child to the home as soon as the emergency has ended; (2) Defendants are violating the Due Process Clause by preventing parents from testifying, presenting evidence, or cross-examining the State's witnesses at the 48-hour hearing; and (3) parents are not being provided adequate notice or the opportunity to be represented by appointed counsel and that the State courts are issuing orders to remove Indian children from their homes without basing those orders on evidence adduced in the hearing). Because ICWA was intended to help prevent the breakup of Indian families; therefore, emergency removals and emergency placements of Indian children should be severely limited, applying only in circumstances involving imminent physical damage or harm. The updated section B clarifies that the guidelines for emergency removal or placement apply regardless of whether the Indian child is a resident of or domiciled on a reservation. This section also explicitly states the standard for determining whether emergency removal or emergency placement is appropriate— i.e., whether it is necessary to prevent imminent physical damage or harm to the child—and provides examples. The guidelines clearly state that the emergency removal/placement must be as short as possible, and provides guidance on how to ensure it is as short as possible. It also shortens the time period for temporary custody without a hearing or extraordinary circumstances from 90 days to 30 days. This shortened timeframe promotes ICWA's important goal of preventing the breakup of Indian families.

**2/11/2020 - HEARING - CONTINUANCE**

Kathleen, Don and Alex all go to court in support of Alex.  Both Alex's parents attended the first
Court hearing in February of 2020 and informed the court that the defendants guardianship petition
was frivolous. They explained that the defendants knew exactly the whereabouts of Alex and were
aware of the childcare arrangements the mother made with her father (Don Paul, whom she and the
minor was staying with) and his stepdaughter Rachel. They also informed the Tulsa District Court
that the mother had returned from her trip as planned giving no validity to the abandonment claim.
Even more disturbing is the Courts being made aware of how the defendants retained physical
possession of the child by kidnapping the her from her crib while her mother was asleep in the very
next room. Then subsequently driving around for hours with the child to avoid the mother or police
finding them. Don Paul also told the Tulsa District Court Judge that his son had no reason to take the
child and refused to give the child back. Despite this, the Tulsa District Court ordered a continuance
and would not return the Indian child to her mother as the ICWA prescribes pursuant to; FEDERAL
CODE 23.113 which is a clear violation of the ICWA § 1920.

**4/1/2020 - ALEX MOVES BACK HOME DEVASTED**

**6/2020 - ALEX IN HOSPTIAL (exhibit - 30 Alex in hospital 2020)**

 Alex gives up on life and ends up in hospital and truly believes she will not make it out of there
alive.  Beaten down, depressed, discouraged, devastated.  Alex calls Justin while she is in the
hospital and beseeches Justin to let her speak to her daughter before she dies.  He tells her no and
tells her T.A.J. would be better off if she went ahead and died (exhibit - 22 Carries affidavit).

7/2019 - BACKGROUND CHECK FINALLY COMES IN

Defendants avoided the background check up until this point.

§30-2-101. *4. Except in the case of an emergency guardianship placement, the court
shall receive a background check for a prospective guardian and all other household members*

*eighteen (18) years of age and older..*

**8/26/2020 - PG-2020-38 CASE DISMISSED**

Case was dismissed for good cause and lack of notice to Tribe, BIA, and Father.  There was no mention of the State of Texas or the Mother.

8/26/2020 - PG-2020-557

DEFENDANT FILES ANOTHER ER PETITION WITH DIFFERENT JUDGE

Wendy refuses to return the child to her mother and Wendy goes to a different Judge and files ANOTHER emergency guardianship with just her name on it to avoid Justin's 3 felonies.  Justin leaves the courthouse with the child while Wendy takes an elevator to file another petition upstairs. As Alex and Kathleen are trying to find Wendy to get the child back, they see her laughing at Alex as she gets into the elevator.

INSTRUMENTS INVALIDATED, again.

She now claims she has been the primary provider of the proposed Ward, T.A.J. since birth (exhibit PG-2020-557 ) and is the grandmother of the child. (exhibit 32 –PG-2020-557 Petition for General Guardian,)

Still have Choctaw as child's Tribe

**9/2020 - MOTHER FILES FOR AN EXPEDITED HEARING**

**10/2020 - DEFENDANTS CONCEAL DHS RECORDS**

"SHE'S YOURS NOW"

- Morning of court, Wendy Walker posts a picture of herself, Justin and T.A.J. on her Facebook page stating, "our baby girl".  Someone with the last name of Walker, assuming related to Wendy Walker, comments;

    "beautiful, she's yours now".  (EXHIBIT 36 - she's yours now).

 - Wendy posts it again after the 11/2/2023 hearing stating, "home sweet home".  This shows the lack of regard the defendant has for the mother of the child and her family.

10/30/2020 - HEARING, finally.  PG-2020-38 CASE DISMISSED
 - The court found that no emergency existed.  (exhibit 31, exhibit 39)  Alex finally gets to prove her innocence (exhibit 35 - hair follicle test).  T.A.J. gets to come home.  (exhibit 38a, 38b).

EMERGENCY PROCEEDING STANDARDS WERE IGNORED

 - Furthermore, the standards for emergency proceedings involving an Indian child were completely ignored.  Allowing this case to go on for 9.5 months without any notice to anyone is contrary to ICWA 1922.

*§ 1922. Emergency removal or placement of child; termination; appropriate action*

*Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child. The State authority, official, or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate.*

*These are clear violations of ICWA and constitutes as grounds for invalidating the court proceedings pursuant to ICWA 1914 and the Tulsa District Rule 8.2.*

**§ 1914. Petition to court of competent jurisdiction to invalidate action upon showing of certain violations.** *Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title. (Pub. L. 95-608, title I, § 104, Nov. 8, 1978, 92 Stat. 3072.)*

*Rules for District Courts of Oklahoma.*

*Rule 8.2. Decrees, Orders or Judgments Affecting Indian Children - Compliance with Certain Laws.*

*All decrees of adoption, divorce or separate maintenance where custody of a minor Indian child or children is given to a third party, all orders of adjudication in juvenile proceedings, termination of parental rights and all final orders in Habeas Corpus and guardianship of the person proceedings resulting in the adjudication of status, custody or wardship of minor children,* **shall contain a finding of compliance with 25 U.S.C.A. 1901 et seq. (Indian Child Welfare Act of 1978) and 43 § 551.101 et seq. (Uniform Child Custody Jurisdiction and Enforcement Act),**

## TEXAS MAINTAINS JURISDICTION (4/2020 - 1/2022)

Alex moved back home to Texas in April of 2020, less than 4 months after the State of Texas made the initial custody determination appointing her permanent conservator. While her child was restrained in Oklahoma due to the wrongful guardianship until 11/2/2020.  They resided in Texas until they moved to Ada in January of 2022.  Any continuing jurisdiction the Tulsa court thought they had was dis-continued at this point.

## 1/2022 - MOVE TO ADA, OKLAHOMA WITH CHICKASAWS

1/4/2022 - Alex moves from her mother's home to Ada, Oklahoma with the help of the Chickasaws.  Alex begins letting Wendy see T.A.J. for the first time since 11/2/2020, however, she informed them she had "protections" in place so they could not ever get her daughter again and would make them sign a document stating she will not steal her again in order to visit with her. (exhibit 42). She confided in several friends and family members that she knew immediately she screwed up by allowing them back into her life. (exhibit 44a, 44b)   (exhibit Chickasawproud video)

1/15/2022 - Just a week in Wendy was already over stepping her boundaries (exhibit - affidavit Ginger Jester).

ALEX CUTS TIES

6/4/2022 - by this time Alex in full blown fear "Wendy was after her kid" and stopped allowing her to see T.A.J. but kept things on the down low as to not make them mad...last time they got mad they kidnapped her daughter.  ironically, 5 months is all it took for Wendy to feel entitled to have her daughter the first time, then 5 months to feel entitled to take her daughter after she dies.

6/7/2022 - visits Texas, she is ready to come back.

7/14/2022 - comes to finish court stuff her dad was working on for her.  tells a friend "I don't want T.A.J. anywhere around them, Wendy is fake and Justin will destroy her like he did me". She stated she was moving back home because she could deal with her issues better here. (exhibit 22). She also confided in multiple friends and family members that Wendy was after herkid again and she made a big mistake by allowing her to see T.A.J. again.

# DEATH OF MINORS MOTHER

8/12/2022 9:05 AM - Death of T.A.J.s mother (exhibit) being the first to be notified of Alex's death due to T.A.J.s failed attempts to reach her Grandma, Grandpa and Aunt, they took the opportunity to once again take advantage a vulnerable, now deceased mother and her child. ***The defendants lied to law enforcement and concealed her death for 7-8 hours to gain physical possession of child then transport her off the reservation to their residence in Tulsa.*** Had Alex's mother and sister been notified, the defendants would not have gone home with Alex's child.

§30-1-111. 6. Defines "Exploitation" means an unjust or improper use of the resources of an incapacitated person, a partially incapacitated person, or a minor for the profit or advantage, pecuniary or otherwise, of a person other than an incapacitated person, a partially incapacitated person, or a minor through the use of undue influence, coercion, harassment, duress, deception, false representation, or false pretense;

# DEFENDANTS CONCEAL THE DEATH OF ALEX FOR 8 HOURS

**4:09 PM** - Justin Paul doesn't call Erika Sprabary to inform her Alex is gone until 4:09 pm.  He stated that no one else knew, that she was the first person he called and that he had not even called their father yet.  When she states she is on her way, he claims the police wouldn't let anyone come to the scene due to the "mess" and condition of her body (smell).  There was no mention that she died 7-8 hours earlier.  Erika asked where T.A.J. was in which he responds, with us.  He states she is okay for now and that she needed to go inform her mother and sister. (see timeline exhibit)

T.A.J. had not only spent over two days with her deceased mother in the middle of August with no air-conditioning, she spent that time alone in the dark.  Recovered videos shows T.A.J. sitting next to her deceased mother, in the dark and sweating.  T.A.J. told the neighbor she slept with her mother one night but had to sleep on the sofa the next night.  The Biohazard report shows toxic fluids on the walls, bed and a significant puddle on the floor.  Not to mention the car

accident she was in the day her mother died.  Yet the defendants nor anyone at the scene thought it would be necessary for T.A.J. to be sent to the hospital (where Alex's mother was listed as her emergency contact) for an evaluation.  No one questioned the expedited rate at which Alex's body was decomposed or why the food in both freezer and fridge were spoiled or why T.A.J. had to ask someone to charge her phone.  Instead, she is released to aman with 3 dui felonies and no driver's license without verifying anything.   An Extremely negligent decision that accounts for why we are here today.

 We were robbed of saying goodbye. We would have hugged and kissed Alex no matter how stinky or swollen she was.   We were denied our rightful place to be there for her and take care of her daughter the way she knows we would have.  Unlike Wendy who didn't even bother to show up and instead sent Justin to pick her up, knowing he doesn't have a driver's license.  Justin did not go in to see her body for T.A.J.s sake.   It was necessary to know and understand what she had been through and saw those two and half days.  She shouldn't have to hold that memory alone.

It was Alex's mother and sister that did the due diligence to discover the electricity had been off, that she was exposed to toxic waste, was in the car accident, what exact minute Alex died, what T.A.J. had done during that time, did the open records requests, spoke to the neighbors to know that she kept her from seeing all the police cars etc.

## 8/17/2022 - ER PETITION FOR GUARDIANSHIP (PG-2022-640)

After wrongfully gaining physical possession of the child, by concealing the mother's death for over 7 hours from her family, Wendy Walker files 3rd "Emergency" petition for guardianship withholding and misrepresenting crucial information. (exhibit - 55 Application for Special Guardianship).

**ALEX PAULS WORST FEAR**

A pattern that began just a few months after defendants met the child for the first time when she was nearly two years old.  A pattern T.A.J.s mother knew all too well, so much so, she prepared a witnessed written document nominating her mother, sister or step brother to care for T.A.J.

should something happen to her and left a file of evidence labeled "if they try to take her again".

## JURISDICTION = CHICKASAW TRIBAL COURT

Alexandra Paul, Trever and T.A.J. Jester were domiciled on the Chickasaw reservation at the time of Alex's death.  Her rent was paid through October 2022 giving the Tribe Exclusive Jurisdiction pursuant to;

*§ 1911. Indian tribe jurisdiction over Indian child custody proceedings.  (a) Exclusive jurisdiction.  An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.*

UNVERIFIED PETITION/INSTRUMENTS

The Court did not verify any of the instruments in which Wendy Walker nominated herself pursuant to;

*§30-2-101. **When guardian of minor to be appointed - Petition - Notice.**  B. Such appointment may be made on the **verified petition of a relative** or other person in behalf of such minor.*
*§30-3-101. **Petition for appointment of guardian.**  B. The petition shall be **verified...***

*The trial court shall in all such proceedings make findings of fact as to the child's correct, full legal name and date of birth and all instruments memorializing such decrees, orders and judgments shall recite the findings required hereby. See 25 U.S.C.A. 1901 et seq. (Indian Child Welfare Act of 1978).*

## - UCCJEA

Defendant, Wendy Walker states the child had lived with her the last 5 years and omits all of child's Maternal and Paternal families.  (Exhibit 1).  **Such willful omission goes directly to the**

**best interest and safety of T.A.J. which demonstrates an adverse interest to the faithful performance of the guardians.**

*43 § 551-209* *Section 551-209 - Information to be submitted to court*

*A. In a child custody proceeding, each party, in its first pleading or in an attached affidavit, shall give information, if reasonably ascertainable, under oath as to the child's present address or whereabouts, the places* **where the child has lived during the last five (5) years, and the names and present addresses of the persons with whom the child has lived during that period. The pleading or affidavit must state whether the party:**

**1. Has participated, as a party or witness or in any other capacity, in any other proceeding concerning the custody of or visitation with the child and, if so, identify the court, the case number, and the date of the child custody determination, if any;**

**2. Knows of any proceeding that could affect the current proceeding, including proceedings for enforcement and proceedings relating to domestic violence, protective orders, termination of parental rights, and adoptions, and, if so, identify the court, the case number, and the nature of the proceeding; and**

**3. Knows the names and addresses of any person not a party to the proceeding who has physical custody of the child or claims rights of legal custody or physical custody of, or visitation with, the child and, if so, the names and addresses of those persons.**

*B. If the information required by subsection A of this section is not furnished, the court, upon motion of a party or its own motion, may stay the proceeding until the information is furnished.*
*C. If the declaration as to any of the items described in paragraphs 1 through 3 of subsection A of this section is in the affirmative, the declarant shall give additional information under oath as required by the court. The court may examine the parties under oath as to details of the information furnished and other matters pertinent to the court's jurisdiction and the disposition of the case.*
*D. Each party has a continuing duty to inform the court of any proceeding in this or any other state that could affect the current proceeding.*

**NON-COMPLIANCE WITH ICWA, UCCJEA AND RULE 8.2**

Rules for District Courts of Oklahoma.  Rule 8.2. Decrees, Orders or Judgments Affecting Indian Children - Compliance with Certain Laws.

All decrees of adoption, divorce or separate maintenance where custody of a minor Indian child or children is given to a third party, all orders of adjudication in juvenile proceedings, termination of parental rights and all final orders in Habeas Corpus and guardianship of the person proceedings resulting in the adjudication of status, custody or wardship of minor children, *shall contain a finding of compliance with 25 U.S.C.A. 1901 et seq. (Indian Child Welfare Act of 1978) and 43 § 551.101 et seq. (Uniform Child Custody Jurisdiction and Enforcement Act),*
The trial court shall in all such proceedings make findings of fact as to the child's correct, full legal name and date of birth and all instruments memorializing such decrees, orders and judgments shall recite the findings required hereby. See 25 U.S.C.A. 1901 et seq. (Indian Child Welfare Act of 1978).

**GUARDIANSHIP SHOULD HAVE BEEN TERMINATED BASED ON THIS ALONE PURSUANT TO;**

*Title 30. §30-4-801 Guardian and Ward*

*6. If the instrument in which the person was nominated as guardian is judicially determined to be invalid*

# 9/13/22 - CHICKASAWS APPOINT GUARDIANS (PG-2022-40)

## 8/30/2022 - SPRABARYS FILE EMERGENCY PETITION IN TRIBAL COURT

After multiple unsuccessful attempts to discuss with Justin Paul the best solution for their niece, it became evident he was not being truthful and our guardianship was sought. Out of respect for her sister and the Chickasaw Tribe and the advice of counsel, they filed the petition in the Tribal Court where they were domiciled.  A hearing was scheduled September 13, 2022.

**9/13/2022 - HEARING, GUARDIANSHIP APPOINTED TO SPRABARYS, PICK UP ORDER ISSUED**

**9/14/2022 - PICK UP ORDER FROM TRIBAL COURT EXECUTION ATTEMPT**

Upon attempting to execute the pick-up order, we were notified of the pending guardianship proceeding in the Tulsa District Court the next day.

# 9/15/2022 - HEARING (PG-2022-640)

**JURISDICTION = CHICKASAW TRIBAL COURT**

Alexandra Paul, Trever and T.A.J. Jester were domiciled on the Chickasaw reservation at the time of Alex's death, giving the Tribe exclusive Jurisdiction pursuant to;

*ICWA § 1911. Indian tribe jurisdiction over Indian child custody proceedings.*

*(a) Exclusive jurisdiction.  An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.*

*"ICWA gives tribal governments a strong voice concerning child custody proceedings that involve Native children, by allocating tribes exclusive jurisdiction over the case when the child resides on, or is domiciled on, the reservation, or when the child is a ward of the tribe; and concurrent, but presumptive, jurisdiction over non-reservation Native Americans' foster care placement proceedings."*

NO SERVICE TO FATHER/TRIBE = NO JURISDICTION

The Tulsa District Court did not have Jurisdiction to determine guardianship matters until *after* service of notice pursuant to *§30-1-113 (b) and the Oklahoma UCCJEA*, making the concurrent jurisdiction inapplicable.  The father had not received notice and the Tribe did not receive notice until 2 days before the proceeding. The service tracking number (exhibit 70, 76) to the father confirmsit was returned to sender (Welsh) on 8/29/2022, yet no other attempt was made or diligent effort whatsoever.  The notice was sent to the Marshall jail 2 days after he was released, rather than hisphysical address on the reservation.  The Tribe did not receive notice until 2 days before the proceeding as confirmed by the tracking number (exhibit 2).

*§30-1-113 B. **After** the service of notice in a proceeding seeking the appointment of a guardian or other order, in subsequent proceedings pertaining to the guardianship of a ward and until termination of the proceeding, the court in which the petition is filed has exclusive jurisdiction to determine: 1. The need for a guardian or other order; and 2. How the estate of the ward shall be managed, expended, or distributed to or for the use of the ward or the dependents of the ward.*

NO SERVICE TO FAMILY AS ORDERED BY COURT

In addition, no one entitled to receive notice was served (exhibit - hearing notice).

*§30-2-101 D. In addition, **before making the appointment**, the court must cause notice of the hearing on the petition for appointment of a guardian for a minor to be given in the form required by the court to the minor if the minor has attained the age of fourteen (14) as of the date the petition is filed. The court shall also cause notice to be sent to the following persons:*
*1. The then-living parents of the minor and any other person having custody of the minor, if such parent or person is not one of the petitioners;*
*2. If the minor has no then-living parent, then to one of the then-living grandparents who is not one of the petitioners and who is not married to one of the petitioners; and*

NO SERVICE TO FATHER/TRIBE = NO FOSTER CARE PLACEMENT PROCEEDING

The Tulsa District Court held the proceeding in violation of ICWA pursuant to;

**ICWA 1912 a.** "No foster care placement or termination of parental rights proceeding shall be held  until at least ten days after **receipt** of notice by the parent or Indian custodian and the tribe" .

SPECIAL GUARDIANSHIP NO LONGER NECESSARY UPON TRIBAL COURT APPOINTMENT OF GUARDIANS on 9/13/2022
In addition to the Tulsa District Court not having jurisdiction and holding a proceeding before the Father, Tribe and family had proper notice, the court was made aware that the Tribal Court appointed Guardians on 9/13/2022 and that the "emergency" induced by defendants was resolved.  Upon this finding the Tulsa District Court should have dissolved the Special Guardianship and returned the child to the proper Guardian and Indian custodian immediately pursuant to;

**Title 30, E.** The court shall grant the special guardian only those powers necessary to act with respect to the particular emergency, as determined by the court. The special guardian shall be granted only powers to accomplish acts that are both supported by the proposed emergency plan of care and found necessary by the court.

**UCCJEA a**pplication to Indian tribes.
(1) A state court must treat a tribe as if it were a state of the United States when applying 43 O.S. §§ 551-101 through 551-210.
(2) A child custody determination by a tribe made in conformity with this act must be recognized and enforced.

**ICWA §1922.** Emergency removal or placement of child; termination; appropriate action.  Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child. The State authority, official, or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary  to prevent imminent physical damage or harm to the child and shall

*expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian as may be appropriate.*

*§1920. Where any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody **the court shall decline jurisdiction over such petition and shall forthwith return the child to his parent or Indian custodian** unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger.*

*25 U.S.C. § 1911, (b) In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent **or the Indian Custodian** or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.*

***The BIA Guidelines** defines Indian custodian, **"any person who has legal custody of an Indian child under tribal law or custom or under State law, whichever is more favorable to the rights of the parent, or to whom temporary physical care, custody, and control has been transferred by the parent of such child."***

DOMESTIC VIOLENCE, ABUSE, SEXUAL ABUSE CONCERN, DOG ATTACK **IGNORED**.  The mother of the child left a file with evidence of the abuse, domestic violence, sexual abuse and the dog attack they were subjected to in the defendant's home. The Tribal Court had addressed this in the hearing that appointed the Emergency Guardianship to the Sprabary's.  However, the Tulsa District Court ignored it in violation of;

*UCCJEA,* "Emergency (governs situations such as abandonment or abuse that require immediate protective action".

**NO DETERMINATION FOR NOT RETURNING TO INDIAN CUSTODIAN**

There was no determination that returning the child to the Indian Custodian/Guardians would cause serious emotional or physical damage to the child.

*ICWA 1911 (e) No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.*

**PREVIOUS CASES AS GROUNDS FOR EXCLUSIVE CONTINUING**

The cases (PG-2020-38 and PG-2020-557) that the Tulsa district court usurped jurisdiction without notice to Texas, The Tribe, Father or Mother through the entirety of the cases. The cases the Court found that no emergency existed to warrant the guardianship that was obtained through fraud and improperly removed then restrained the child in Oklahoma for 9.5 months, causing the child to be separated from her mother and families.

**TEXAS NEVER LOST JURISDICTION**

Alex moved back, without her daughter, 4.5 months after the State of Texas made the initial custody determination on her behalf.  Upon the dismissal on 11/2/2020, Alex was finally able to bring her child home to Texas where they resided at her mother's home until the beginning of 2022 breaking any perceived continuing jurisdiction.

**TEXAS SIGNIFICANT CONNECTION MAINTAINED**

Additionally, throughout the 8 months they resided on the Chickasaw reservation, they maintained a residence at the Lieberman's and had Texas state benefits.  (exhibit - Texas state benefits)

**CONTINUANCE TO 12/7/2022 (exhibit 9-15-2022 continuance)**

Ultimately, the court failed to validate the instruments, ignored the tribal courts rightful jurisdiction, evidence of abuse and danger to child, claimed they had jurisdiction according to the first two cases and ordered a continuance in violation of ICWA.

> ***ICWA 1915 (b) In any foster care or pre-adoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with-- (i) a member of the Indian child's extended family;***

**NON-COMPLIANCE WITH ICWA**

*Rules for District Courts of Oklahoma.*

*Rule 8.2. Decrees, Orders or Judgments Affecting Indian Children - Compliance with Certain Laws.*

*All decrees of adoption, divorce or separate maintenance where custody of a minor Indian child or children is given to a third party, all orders of adjudication in juvenile proceedings, termination of parental rights and all final orders in Habeas Corpus and guardianship of the person proceedings resulting in the adjudication of status, custody or wardship of minor children, shall contain a finding of compliance with 25 U.S.C.A. 1901 et seq. (Indian Child Welfare Act of 1978) and 43 § 551.101 et seq. (Uniform Child Custody Jurisdiction and Enforcement Act),*

*The trial court shall in all such proceedings make findings of fact as to the child's correct, full legal name and date of birth and all instruments memorializing such decrees, orders and judgments shall recite the findings required hereby. See 25 U.S.C.A. 1901 et seq. (Indian Child Welfare Act of 1978).*

DENIED VISITATION

 After the hearing, in the hallway, Attorney Edward Lindsey requested to arrange grandparent visitation for us, Catherine Welsh, shouted in the hall in an aggressive hostile manner, "No way is that child going to Texas. We won't discuss grandparent visitation until you get Stanton and Erika to drop their guardianship!".

DEFENDANTS FILE MOTION TO DISMISS TRIBAL COURT GUARDIANSHIP
TRIBAL COURT CONTINUED THE SPRABARYS GUARDIANSHIP SET HEARING
12/8/2022


9/20/2022 MOTION TO DISMISS FILED PRO-SE (Exhibit?)
Lieberman's file motion to dismiss but was completely ignored.


FATHER FILES PETITION TO DISMISS/TRANSFER (exhibit)


# 12/7/2022 - HEARING (PG-2022-640)


## FATHERS INDIAN AND CONSTITUTIONAL RIGHTS VIOLATED

Trever Jester, Natural (Indian) Father, whom was not found unfit, attended the 12/7/2022 hearing
with The Sprabary's to contest the Tulsa District Courts appointment of Guardian for his
daughter.  He implored the Court to honor the Tribal Courts appointment and his petition
requesting the case transfer/remain in the Tribal Court.   (exhibit - transcript)


## FATHERS PETITION TO TRANSFER/DISMISS DENIED, NO GOOD CAUSE

Regardless, the Judge denied the Fathers Request before he heard any testimony to justify a
"good cause" not to transfer pursuant to ICWA 1911 (b).  Instead, The Judge cited, "he didn't
want anyone thinking he couldn't work through this himself", ICWA, the **invalidated and
FRAUDULENT UCCJEA form (where defendants omitted all maternal and paternal
family and falsely stated the child had lived with her the last 5 years, exhibit - 57
UCCJEA)** and a brief undocumented conversation with the Tribal Court Judge for his
rationalization that his court was the best court to take care of the guardianship that day (exhibit
90 - good cause).  Obviously, the ICWA was created to the contrary per the BIA, "State agencies
and courts had often failed to recognize the essential Tribal relations of Indian people and the
cultural and social

standards prevailing in Indian communities and families.4 To address this failure, ICWA establishes minimum Federal standards for the removal of Indian children from their families and the placement of these children in foster or adoptive homes, and confirms Tribal jurisdiction over child-custody proceedings involving Indian children."

"Congress enacted ICWA in 1978 to address the Federal, State, and private agency policies and practices that resulted in the ''wholesale separation of Indian children from their families.''2 Congress found ''that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions........ ''3 Although the crisis flowed from multiple causes, Congress found that non-Tribal public and private agencies had played a significant role, and that State agencies and courts had often failed to recognize the essential Tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.4 To address this failure, ICWA establishes minimum Federal standards for the removal of Indian children from their families and the placement of these children in foster or adoptive homes, and confirms Tribal jurisdiction over child-custody proceedings involving Indian children."

To somehow rationalize that it was in the best interest of the Indian parent or Indian child for the state court to dishonor the Indian Fathers nomination and the Tribal Court appointed Guardians does not make sense.

INITIATED PROCEEDING DESPITE FATHER HAVING NO REPRESENTATION

In addition to denying the Fathers request for the case to remain in the Tribal Court, the proceeding occurred without providing the father with adequate legal representation, which is in direct violation of ICWA Section 1912. The importance of adhering to the provisions of ICWA cannot be overstated, as it is intended to protect the rights of Native American parents and families in child custody proceedings. ICWA Section 1912 specifically mandates that active efforts must be made to provide the parent or Indian custodian with representation. In this case, it appears that this crucial step was not taken, depriving the father of his right to due process.

*ICWA 1912 (b) Appointment of counsel.  In any case in which the court determines indigency, the parent or Indian custodian shall have the right to court-appointed counsel in any removal, placement, or termination proceeding. The court may, in its discretion, appoint counsel for the child upon a finding that such appointment is in the best interest of the child. Where State law makes no provision for appointment of counsel in such proceedings, the court shall promptly notify the Secretary upon appointment of counsel, and the Secretary, upon certification of the presiding judge, shall pay reasonable fees and expenses out of funds which may be appropriated pursuant to section 13 of this title.*

*"When ruling on a motion to transfer jurisdiction to tribal court, the party opposing transfer has to prove good cause to keep the case in state court by clear-and-convincing evidence. See In re M.S., 2010 OK 46, ¶ 19, 237 P.3d 161,"*

## FATHER HAD NOT INSPECTED ANY DOCUMENTS

In addition, the father was denied from inspecting the case documents pursuant to;

*(ICWA 1912 (c) Examination of reports or other documents.  Each party to a foster care placement or termination of parental rights proceeding under State law involving an Indian child shall have the right to examine all reports or other documents filed with the court upon which any decision with respect to such action may be based.*

## TRIBAL COURT GUARDIANS WOULD NOT BE HEARD OR CONSIDERED

The proceeding was held knowing the Guardians appointed by the Tribal Court did not have a cross petition filed and would not have an opportunity to be heard.   (exhibit 91)

*Oklahoma UCCJEA, A. Before a child custody determination is made under this act, notice and an opportunity to be heard in accordance with the standards of Section 8 of this act must be given to all persons entitled to notice under the law of this state as in child custody proceedings between residents of this state, any parent whose parental rights have not been previously terminated, and any person having physical custody of the child*

MOTHERS NOMINATION NOT BE HEARD OR CONSIDERED

Alexandra Hayden Paul, whom had sole legal decision-making authority nominated her mother, sister or step-brother in the witnessed document to take care of her daughter T.A.J. Alexis Jester if anything happened to her or in case of her death. (exhibit 56 Alex will)  Her mother, Kathleen Lieberman was also listed as the emergency contact ) at the child's school, in Corinth, Texas Denton County Texas & Ada, Oklahoma Pontotoc County Oklahoma on the Chickasaw Nation reservation where Alexandra Paul, Trever and T.A.J. Jester were domiciled.


FATHERS NOMINATION IGNORED

Upon the Judge asking The Father for his nomination, he stated Erika and Stanton Sprabary. Initially the Judge stated that "we were done here" however backtracked later citing the background check needed to be done before he could appoint them. As a side note, the defendants had been appointed guardians over his child 3 separate times without a background check. He called for lunch break to have the background checks ran. The background check came back in good order, however the Judge did not uphold the Fathers nomination, or the Tribes.

### *Title 43. Marriage and Family*

*§43-112.5. Custody or guardianship - **Order of preference - Death of custodial parent -***

*A. Custody or guardianship of a child may be awarded to:*

*1. A parent or to both parents jointly;*

*2. A grandparent;*

*3. A person who was indicated by the wishes of a deceased parent;*


*Okla. Statue Title 10, Chapter 1B ICWA, 40.6.  The placement preferences specified in 25 U.S.C. § 1915, shall apply to all preadjudicatory placements, as well as*

*preadoptive, adoptive and foster care placements. In all placements of an Indian child by the Oklahoma Department of Human Services (DHS), or by any person or other placement agency, DHS, the person or placement agency shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of the Oklahoma Indian Child Welfare Act. This requirement shall include cases where a consenting parent evidences a desire for anonymity in the consent document executed pursuant to Section 60.5 of this title. If a request for anonymity is included in a parental consent document, the court shall give weight to such desire in applying the preferences only after notice is given to the child's tribe and the tribe is afforded twenty (20) days to intervene and request a hearing on available tribal placement resources which may protect parental confidentiality, provided that notice of such hearing shall be given to the consenting parent.*

NO DETERMINATION OF DAMAGE TO CHILD

The opinion of the "expert" was based solely on the testimony of the defendants.

*(e)  Foster care placement orders; evidence; determination of damage to child.*  **No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.**

TRIBAL COURT GUARDIAN AD-LITEM

The Tribal courts appointed guardian ad-litem would cease with the proceeding.  The judge did not appoint one for child in his court.

DOMESTIC VIOLENCE, SAFETY OF CHILD IGNORED

He also voiced his sincere concern that his daughter was not safe in their home.  He tried to show the Judge the pictures he brought of T.A.J.'s injury after their dog mauled his daughter but the Judge said "that's okay" (exhibit).  The evidence he sent in to the court before the hearing that proved Justin Paul's extensive abuse to Alex and the domestic violence his daughter witnessed in their home was ignored as well.  All of which the Tribal Court had already addressed by issuing the Emergency Guardianship to the Sprabarys, pick up order and appointed her a Guardian Ad-Litem.

GUARDIAN AD-LITEM

The child already had a Guardian ad-litem appointed in the Chickasaw Court, however was not appointed one in the Tulsa Court for over a year later.

## ACTIVE EFFORTS NEXT TO IMPOSSIBLE

As with the previous cases, had the court validated the instruments in which the defendants nominated themselves, the court would have been aware that the State of Texas made the initial child custody determination, was the Home state and that the child and both parents of child had a Significant connection to Texas.

The Father informed the court that he had never met the defendants.  In fact, had never heard of them in all the years he knew Alex until she decided to finish her last two months of her recovery program in Oklahoma.  He nor the families had any inclination the defendants would deceive this court into wrongfully holding the child in Oklahoma.  This caused a massive burden and hardship on the mother and family.  This court did find the guardianship unwarranted, and that no emergency existed, yet here we are again.  Another "emergency" guardianship was awarded to the defendants as a direct result of "no active efforts".

The father expressed he didn't want his daughter 255 miles away from him or our families.  That he wanted her returned to us where ACTIVE EFFORTS could be attainable.  The father and his whole family as well as the mother's family is once again burdened with the hardship of travel now that the defendants have deceived the court for the third time.

The ICWA mandates that active efforts be made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family. It seems that such efforts were not adequately pursued before the court made its determinations.

VISITATION ORDER EVERY THREE WEEKS IN TEXAS

The Judge did, however, grant the father visitation every three weeks supervised by the Sprabarys at their home in Texas.

VISITATION CHANGED TO OKLAHOMA

However, just a couple days later, the defendants and his attorney went against court orders and decided Trever's visitation would be in Tulsa, alone, under their supervision.  Besides not obeying court orders, the **Defendants were in violation of ICWA active efforts** knowing the Father had no transportation and that he was not legally allowed to leave the state of Texas. (exhibit phone call text messages).  This is in contradiction of the defendants claim that they have done everything they can to comply with active efforts.

*(d) Remedial services and rehabilitative programs; preventive measures.  Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.*

DEFENDANTS ALLEGATIONS CHANGE AGAIN/FALSE TESTIMONY

Under oath, Wendy Walker states the reason she got the emergency guardianship was because "Alex disappeared for two weeks".  She does not disclose that she was fully aware where Alex was and why.  Or the fact that Alex had made the childcare arrangements 2 months in advance. Or that Alex made the childcare arrangements with Rachel and her father rather than her.  She also makes the false claim that she knew what the circumstances were at the time which was

false given the fact they had very little opportunity to witness this supposed abuse.  The one-time Alex does permit Wendy to visit her daughter, she allows her to get mauled and bitten by her dog.

## FAILURE TO COMPLY WITH PREFERENCE PLACEMENTS

The result of the hearing was the guardianship was granted to the defendants whom the Tribal Court, the parents and their families specifically opposed.  The Judge ignored the fathers constitutional rights as the only surviving parent to direct the upbringing of their child, the ICWA preferences, and the mothers preference pursuant to:

43 OK Stat § 43-112.5 A. Custody or guardianship of a child may be awarded to:

1. A parent or to both parents jointly;

2. A grandparent;

3. A person who was indicated by the wishes of a deceased parent;

4. A relative of either parent;

§30-2-102. Nominations of guardian.

A. A guardian of the person or estate, or of both, of a child born, or likely to be born, may be nominated by will or by other written instrument, to take effect upon the death of the parent so nominating:

1. If the child is born in wedlock, by either parent or by both parents.

*2.* If the child is born out of wedlock, by the mother of the child or by the natural father of the child, if said natural father has acknowledged paternity pursuant to Section 55 of Title 10 of the Oklahoma Statutes or has been judicially determined to be the father of the child at a paternity proceeding pursuant to Section 70 of Title 10 of the Oklahoma Statutes, ***or by both such mother and father.***

and instead entrapped the father with a hefty list of Standards, without a legal finding of him being unfit or any finding whatsoever to show the Tribe and parents nomination is likely to result in serious emotional or physical damage to the child pursuant to;

*ICWA 1912 (f) Parental rights termination orders; evidence; determination of damage to child.  No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. (Pub. L. 95-608, title I, § 102, Nov. 8, 1978, 92 Stat. 3071.) Section Referred to in Other Sections This section is referred to in sections 1914, 1916 of this title.*

***The Federal Register states** "The "most important substantive requirement imposed on state courts" by ICWA is the placement preference for any adoptive placement of an Indian child. Holyfield, 490 U.S. at 36-37. In any adoptive placement of an Indian child under State law, ICWA requires that a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family (regardless of whether they are Tribal citizens); (2) other members of the Indian Child's Tribe; or (3) other Indian families. 25 U.S.C. 1915(a). ICWA requires similar placement preferences for pre-adoptive placement and foster-care placement. 25 U.S.C. 1915(a)-(b). These preferences reflect "Federal policy that, where possible, an Indian child should remain in the Indian community." Holyfield, 490 U.S. at 36-37 (internal citations omitted)."*

CHRISTMAS VISITATION

Erika arranged Christmas visitation for the whole family (exhibit )

TREVER FILES PAUPERS' AFFIDAVIT TO GET REPRESENTATION

12/15/20022 - Trever pauper's affidavit is filed in the Tulsa District Court to get representation, Jordan Dagleish is appointed (exhibit Jordan's appointed).  He was not afforded the opportunity

to inspect a single document in the case before the Judge placed his daughter with someone he didn't know and 255 miles away on 12/7/2022.

EMERGENCY HEARING TO STOP CHRISTMAS VISITATION

12/15/2022 - Emergency hearing.  Defendants' attorney called an emergency hearing to stop the visitation Erika Sprabary arranged with Justin for Christmas.  The Father was never notified of the proceeding.

**FATHER REPRESENTATION APPOINTED BUT IGNORE HIM**

 12/19/2022 - Jordan Daleish was appointed to be his attorney (exhibit - Trever court appointed attorney).  As a matter of confusion, Berglund, Esq is appointed as well. (Exhibit pauper and 2nd appointment).  The Judge signed off on two different appointed Attorneys for Trever.  Trever's first response regarding his court appointed attorney is from Catherine Welsh, informing him that Jordan Deleisyh is his appointed attorney.  Daleish later emails him to introduce herself and verify his email is correct.  Trever does receive correspondence from Jordan Berglund.  He corresponds with Jordan Daleish for 4 months, repeatly asking for help to get the transcript and his visitation. He informed her the defendants changed the visitation as ordered to tulsa under Justins supervision rather than in Texas at the Sprabarys. After multiple attempts, she asked him why he wanted the transcript in which he relayed that the Judges visitation orders were only on the transcript.  He never received the transcript or visitation.

**TREVER DESIGNATES ERIKA SPRABARY HIS POWER OF ATTORNEY**

Being that Erika was the only one that knew Justin Paul and knowing her relationship with Alex and his daughter, he chose Erika to be the liaison between Justin and our family.  (exhibit 106 - Trever pow)

6/2/2022 - MOTION FOR REMOVAL OF CO-GUARDIANS AND APPOINTMENT OF SUCCESSOR GUARDIAN

8/26/2023 - HEARING (PG-2022-640)

11/2/2023 - HEARING (PG-2022-640)

PREJUDICE - NO DUE PROCESS

**UCCJEA**

Interstate Cooperation Develop a protocol (using telephonic, video, or other forms of communication) to enable out-of-state litigants to participate in court hearings without returning to dangerous jurisdictions.  Provide information to out-of-state litigants upon request.  Respond to requests for information about court filings and issued orders from litigants located outside the state, unless expressly prohibited by law or court rule. Inform litigants who cannot appear in person for safety, financial, or other reasons about how they may request permission to appear remotely by telephone, video, or other means.

**RULE 34;**  The "expert witness" that had never spoke with T.A.J.s Father or family and allowed her to give testimony via teleconference with less than an hours notice,citing rule 34 as justification even though she was only a few miles away.  In a subsequent hearing on 11/2/2023, the Judge cited the same rule as reason to not allow the Father to join via teleconference and insisted the Father come in person or give a 30-day notice of his need to teleconference.  Besides being biased, this is against ICWA and UCCJEA standards. It should also be noted the Judge was the one that suggested him joining via teleconference in the previous hearing.  Due process requires that the procedures by which laws are applied must be evenhanded, so that individuals are not subjected to the arbitrary exercise of government power.   (exhibit transcripts 12/7/22 and 11/2/22)

ADVERSE INTEREST

AIDING ALCOHOL AND MEDS

2/2022 - giving her meds and drinking (exhibit 100 - meds)

SHARED CUSTODY

2/2022 - just 2 months in she was telling people she shared custody with Alex. (exhibit 102 - shared custody).

SHES YOUR NOW (exhibit 36)

CONCLUSION

   For the reasons discussed above, we respectfully request that the court invalidate the court proceedings pursuant to ICWA 1914. . . The evidence presented clearly demonstrates the defendant's unjustifiable conduct to gain physical possession of the child and usurp jurisdiction for the purpose of retaining the child

   "In order for this court to find plain error, the error must affect substantive rights and be obviously prejudicial.  Burford, 515 P.2d at 383.   As we stated in Miller v. Sears, 636 P.2d 1183, 1189 (Alaska 1981), "[p]lain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted."

This is such a case. The due process right to proper notice in a parental rights termination proceeding is so fundamental that justice requires us to consider S.M.'s claim of defective notice. Furthermore, the ICWA specifically authorizes a parent to "petition any court of competent jurisdiction to invalidate [a termination of parental rights] upon a showing that such action violated" certain ICWA provisions, including the act's notice requirements.  25 U.S.C.

§ 1914. [FN4]  The guardian ad litem relies on this provision to argue that S.M. has a right under federal law to be heard on the defective notice issue even though it was not raised below."